[No. G041906. Fourth Dist., Div. Three. Oct. 6, 2010.]

PHIL HOLMES et al., Plaintiffs and Appellants, v.
SIEGLINDE SUMMER et al., Defendants and Respondents.

Counsel

Adorno Yoss Alvarado & Smith, Keith E. McCullough and Kevin A. Day for Plaintiffs and Appellants.

Harbin & McCarron, Richard H. Coombs, Jr., and Andrew McCarron for Defendants and Respondents.

Opinion

MOORE, J.—Particularly in these days of rampant foreclosures and short sales, "[t]he manner in which California's licensed real estate brokers and salesmen conduct business is a matter of public interest and concern. [Citations.]" (*Wilson v. Lewis* (1980) 106 Cal.App.3d 802, 805–806 [165 Cal.Rptr. 396].) When the real estate professionals involved in the purchase and sale of a residential property do not disclose to the buyer that the property is so greatly overencumbered that it is almost certain clear title cannot be conveyed for the agreed-upon price, the transaction is doomed to fail. Not only is the buyer stung, but the marketplace is disrupted and the stream of commerce is impeded. When properties made unsellable by their debt load are listed for sale without appropriate disclosures and sales fall through, purchasers become leery of the marketplace and lenders preparing to extend credit to those purchasers waste valuable time in processing useless loans. In the presently downtrodden economy, it behooves us all for business transactions to come to fruition and for the members of the public to have confidence in real estate agents and brokers.

The case before us presents the interesting question of whether the real estate brokers representing a seller of residential real property are under an obligation to the buyers of that property to disclose that it is overencumbered and cannot in fact be sold to them at the agreed-upon purchase price unless either the lenders agree to short sales or the seller deposits a whopping $392,000 in cash into escrow to cover the shortfall. Here, the buyers and the seller agreed to the purchase and sale of a residential real property for the price of $749,000. Unbeknownst to the buyers, the property was subject to a first deed of trust in the amount of $695,000, a second deed of trust in the amount of $196,000 and a third deed of trust in the amount of $250,000, for a total debt of $1,141,000, and the lenders had not agreed to accept less than the amounts due under the loans in order to release their deeds of trust. According to the buyers, after they signed the deal with the seller, they sold their existing home in order to enable them to complete the purchase of the seller's property. Only then did they learn that the seller could not convey clear title because the property was overencumbered.

In a lawsuit against the seller's brokers, the trial court sustained a demurrer without leave to amend, holding that the brokers owed no duty of disclosure to the buyers. The buyers appeal. We reverse, holding that, under the facts of this case, the brokers were obligated to disclose to the buyers that there was a substantial risk that the seller could not transfer title free and clear of monetary liens and encumbrances.

# I

## FACTS

Phil and Jenille Holmes (buyers) made the following allegations in their first amended complaint against Sieglinde Summer and Beneficial Services, Inc. (collectively brokers). Summer is a licensed real estate broker who represented the seller of certain residential real property located in Huntington Beach, California. Summer was employed by Beneficial Services, Inc., which operated a RE/MAX office in Huntington Beach.

The brokers listed the property for sale on a multiple listing service, advertising a price of $749,000 to $799,000. The listing noted that the seller was motivated and that Summer would receive a 3 percent commission for the sale. The buyers saw the listing on the multiple listing service Web site and became interested in the property. Summer showed them the property, and made no mention of any encumbrances on the property that might affect the ability of the seller to sell at the advertised price.

The buyers offered to purchase the property for $700,000, free and clear of all monetary liens and encumbrances other than a new loan in the amount of $460,000, escrow to close in 60 days. The brokers prepared a counteroffer on the seller's behalf, with a sales price of $749,000 and a 30-day escrow. The buyers accepted the counteroffer. The counteroffer did not disclose that the property was subject to three deeds of trust totaling $1,141,000. Unbeknownst to the buyers at the time they signed the purchase documents, the property could not be transferred to them free and clear of all monetary liens and encumbrances, other than their own purchase money deed of trust, because the existing debt on the property far exceeded the purchase price. The buyers suffered damage in an amount to be proven at trial.

The first amended complaint asserted causes of action for negligence, for negligent misrepresentation, and for deceit—based on both misrepresentation and the failure to disclose. The brokers filed a demurrer. They argued that the

lawsuit was a disguised effort to require the brokers to guarantee the seller's performance. They also asserted that if the seller decided to sell the property at a loss, such that it would have to come up with cash to close the transaction, but then changed its mind, that was a business decision for which the brokers could not be held liable.

In their opposition to the demurrer, the buyers stated that Summer had admitted both that she knew about the excess debt when she listed the property on the multiple listing service and that she did not disclose the excess debt to the buyers. The buyers also alleged that Summer was actually attempting to arrange a "short sale," which would have required the lenders to accept less money than was owing to them in order to retire the debt against the property. In addition, the buyers asserted that, during escrow, the lenders refused to discount the loans and demanded full payment before they would release their liens against the property.

The court sustained the demurrer without leave to amend and ordered the dismissal of the first amended complaint. Judgment was entered accordingly.

II

DISCUSSION

A. *Standard of Review*

"We independently review the ruling on a demurrer and determine de novo whether the complaint alleges facts sufficient to state a cause of action. [Citation.] We assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded, and matters of which judicial notice has been taken. [Citation.] We construe the pleading in a reasonable manner and read the allegations in context. [Citation.] We affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons. [Citation.]" (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 111 [55 Cal.Rptr.3d 621].)

B. *Seller as Indispensable Party*

The buyers' first argument is that the court erred in finding that the seller was an indispensable party to the litigation and in sustaining the demurrer because of the failure to name the seller as a defendant. However, the court made no such finding or ruling, as we shall show.

At the hearing on the brokers' demurrer to the buyers' original complaint, the court asked why the seller had not been named as a defendant in the case. The buyers expressed doubt that the seller could pay a judgment. The court stated that the complaint lacked any allegation of personal knowledge on the part of the brokers, and suggested that the buyers' real claim was against the seller. It sustained the demurrer to the original complaint, with leave to amend.

At the hearing on the demurrer to the first amended complaint, the court concluded: "Well, I said this last time, and I repeat it this time. I think you've got a great lawsuit against the seller of the property, but the seller of the property is not a named defendant in this case. I'm guessing that the seller, because the seller is upside down in this, is basically judgment proof. And so you're searching around for a deep pocket. The deep pocket is the brokerage. But the brokerage appears . . . under the circumstances to have done nothing that breached any duty to your client, certainly did not engage in fraud that you allege. Basically I think the ruling in sum is that you picked the wrong target here." It then sustained the demurrer to the first amended complaint without leave to amend.

As the foregoing shows, the court never stated that the seller was an indispensable party. Rather, the court said that the brokers had breached no duty to the buyers. At the same time, the court indicated a certain amount of sympathy for the buyers and suggested that they pursue an action against the seller—the party that had agreed to convey title free and clear for $749,000 and then failed to do so. This is not the same as saying that the demurrer was sustained without leave to amend for failure to join an indispensable party. The buyers simply misread the reporter's transcript. Consequently, we need not address their authorities concerning indispensable parties.

## C. Brokers' Duty to Buyers

### (1) Introduction

The buyers are correct that the fundamental issue is not whether they should have sued the seller. The question, aptly framed by the trial court, is whether the defendants before us—the brokers—owed a duty of disclosure to the buyers. We turn now to that issue.

According to the allegations, the brokers represented that the property could be purchased for $749,000, and indeed negotiated a sale for that price,

even though they knew that the property was encumbered with $1,141,000 in debt. In other words, the brokers knew that the property could not in fact be sold for the price of $749,000, free and clear of monetary liens and encumbrances, unless either two or more lenders agreed to discount the debt on the property by a total amount of $392,000 or the seller put at least $392,000 in cash into the escrow in order to pay off the lenders. Three hundred ninety-two thousand dollars is not exactly "chump change." This is a substantial amount of money either for lenders to forego collecting or for a seller to "cough up," so to speak. Furthermore, the seller had to gain the cooperation of not just one, but two or more lenders to obtain the necessary debt relief.[1] Considering the magnitude of the discrepancy between the sales price and the total debt on the property, the buyers argue the brokers were obligated to disclose the excess debt because it indicated a substantial risk, over and above that inherent in the routine residential sales transaction, that the escrow would not close.

The brokers, on the other hand, argue that they were precluded from disclosing the financial issues affecting the transaction. They say that for them to have made the disclosure in question would have required them to disclose the seller's confidential financial information or its strategy in determining the price at which it would be willing to sell. The brokers also assert that it would have required them to disclose that the seller might lose money on the property.

The parties agree as to one matter, however. "The existence of a legal duty is a question of law for the court. [Citations.]" (*Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 41 [269 Cal.Rptr. 228] (*Krug*).)

### (2) *General rule*

 As the buyers point out, "It is now settled in California that where the seller knows of facts materially affecting the value or desirability of the property which are known or accessible only to him and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer, the seller is under a duty to disclose them to the

---

[1] Of course, the assent of only one lender would have been required if the fully secured holder of the first deed of trust were willing to walk away from $392,000. That being an unlikely turn of events, it seems almost certain that the holders of both the second and third deeds of trust would have had to agree to substantial discounts in order for the transaction to close at the negotiated sales price.

buyer. [Citations.]" (*Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 735–736 [29 Cal.Rptr. 201]; accord, *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1382 [89 Cal.Rptr.3d 659] (*Alfaro*).) When the seller's real estate agent or broker is also aware of such facts, "he [or she] is under the same duty of disclosure." (*Lingsch v. Savage, supra*, 213 Cal.App.2d at p. 736.) A real estate agent or broker may be liable "for mere nondisclosure since his [or her] conduct in the transaction *amounts to a representation of the nonexistence of the facts which he has failed to disclose* [citation]." (*Ibid.*)

According to the buyers, the monetary liens and encumbrances on the property affected both the value and the desirability of the property. Because the brokers were aware of the magnitude of the debt, and should have known that the buyers were not aware of the same, the brokers had a duty to disclose the problem. By their silence, the brokers represented the nonexistence of any impediments to the transfer of title free and clear of monetary liens and encumbrances. The brokers, on the other hand, contend there is no connection between the amount of debt on the property and the value or desirability of the property, at least where, as here, the seller agrees to sell the property free and clear of monetary liens and encumbrances. In other words, the physical characteristics and intrinsic desirability of the property are distinct from the financing.

■ The latter viewpoint misses the big picture. While a buyer may be harmed by acquiring title to a property with undisclosed defects, such as hazardous waste or soil subsidence problems, a buyer may also be harmed by entering into an escrow to purchase property when it is highly likely that, unbeknownst to the buyer, the escrow will never close. We must bear in mind that the main purposes of the rule expressed in *Lingsch v. Savage, supra*, 213 Cal.App.2d 729, "are to protect the buyer from the unethical broker and seller and to insure that the buyer is provided sufficient accurate information to make an informed decision whether to purchase." (*Easton v. Strassburger* (1984) 152 Cal.App.3d 90, 99 [199 Cal.Rptr. 383].) "Despite the absence of privity of contract, a real estate agent is clearly under a duty to exercise reasonable care to protect those persons whom the agent is attempting to induce into entering a real estate transaction for the purpose of earning a commission. [Citations.]" (*Id.* at p. 98, fn. 2.)

Here, the buyers say that they sold their existing home in order to purchase the seller's property and were damaged when the seller failed to convey title. Whether or not the brokers knew the buyers would need to sell their existing home in order to complete the transaction, it should be perfectly foreseeable to an experienced real estate agent or broker that one who is purchasing a $749,000 residence may need to sell an existing residence in order to make the move.

■ Although the duty to disclose a physical property defect is not at issue, we observe that real estate agents or brokers have been held to have a duty to disclose matters that do not pertain to physical defects, but otherwise affect the desirability of the purchase. (See, e.g., *Alexander v. McKnight* (1992) 7 Cal.App.4th 973 [9 Cal.Rptr.2d 453] [duty to disclose neighborhood nuisance]; *Reed v. King* (1983) 145 Cal.App.3d 261 [193 Cal.Rptr. 130] [duty to disclose murders on the property]; *Lingsch v. Savage, supra,* 213 Cal.App.2d at p. 737 [duty to disclose that improvements were constructed in violation of building codes or zoning regulations].) They have also been held to have a duty to disclose conditions to close of escrow. (*Wilson v. Lewis, supra,* 106 Cal.App.3d at pp. 807–809 [duty to disclose conditions regarding inspection and date of deposit].) Here, we have at issue the duty of the brokers to disclose an impediment to the ability of the seller to convey title free and clear of monetary liens and encumbrances. While the buyers here were not harmed by taking title to defective property, they allege that they were harmed by the failure of the seller to convey title, a failure that should have been perfectly foreseeable to the brokers. To impose a duty on the brokers here to disclose information alerting the buyers that the sale was at high risk of failure would be to further the purpose of protecting buyers from harm and providing them with sufficient information to enable them to wisely choose whether to enter into the transaction. (Cf. *Easton v. Strassburger, supra,* 152 Cal.App.3d at p. 99.)

In addition to arguing that the rule enunciated in *Lingsch v. Savage, supra,* 213 Cal.App.2d 729 is inapplicable because we are not talking about the value or desirability of the property itself, as opposed to the desirability of entering into a contract to purchase the property, the brokers also argue that the rule is inapplicable because the liens were disclosed during escrow and because the buyers failed to protect themselves. However, as to the first point, the allegation here is that the brokers had a duty to disclose the liens *before* the buyers signed the agreement. Only then could the buyers weigh the risks of entering into an agreement and preparing their finances and related affairs to facilitate completion of the purchase, considering there was a significant possibility the transaction would fall through. Disclosing the liens only after the buyers had entered into the escrow failed to protect them in this context.

The brokers' second point goes to the latter portion of the *Lingsch* rule, that is, that the information in question must be unknown to, or outside "the diligent attention and observation of the buyer . . . ." (*Lingsch v. Savage, supra,* 213 Cal.App.2d at p. 735; see also Civ. Code, § 2079.5.) The argument would be that inasmuch as the encumbrances in question were reflected by deeds of trust of record, a diligent buyer could have done a title search before making an offer on the property, in order to avoid exactly the situation that occurred.

This argument is unpersuasive for two reasons. First, even though a title search might have divulged the existence of recorded deeds of trust against the property, it would not likely have disclosed the current balances of the promissory notes secured by those deeds of trust, unless foreclosure proceedings had been commenced. (See Civ. Code, § 2924f.) Second, it is not typical in a residential purchase in California for a buyer to perform a title search on each property of interest before deciding whether to make an offer on one of them. Rather, it is more typically the case that a preliminary title report is provided to the buyer during escrow, so that the buyer can determine, before closing escrow, whether there are any title defects that are unacceptable to the buyer. Moreover, when a buyer makes an offer to purchase the property free and clear of all liens and encumbrances, and the seller agrees to sell on those terms, the seller impliedly represents that he or she expects to be in a position to deliver title free and clear.

The agreement the buyers and the seller signed in the matter before us illustrates the point well. They executed a California Association of Realtors (CAR) standard form "California Residential Purchase Agreement and Joint Escrow Instructions," and a CAR standard form counteroffer. "CAR is an association of licensed realtors and realtor-associates that 'develops and publishes standard forms and publications for specific use and reference by the real estate industry.' [Citation.]" (*Manderville v. PCG&S Group, Inc.* (2007) 146 Cal.App.4th 1486, 1492 [55 Cal.Rptr.3d 59].) Paragraphs 12 and 14 of the first document specified that the seller would deliver a current preliminary title report to the buyers within seven days of acceptance of the deal. In other words, the buyers expected, based on the standard form documents they signed, as representative of industry standards, that they would receive a preliminary title report after their offer was accepted and escrow was opened. They were given no reason to believe that they needed to pay for a title search before even making an offer on the property.

As a final note, we observe that even when a buyer is on constructive notice of matters of record, that does not necessarily mean a cause of action in tort arising out of failure to disclose will not lie. In *Alfaro, supra,* 171 Cal.App.4th 1356, residential purchasers alleged that when they entered into purchase contracts they were not informed of the existing affordable housing restrictions recorded against the properties. In lieu of monetary downpayments, the purchasers invested substantial time and labor in the construction of the homes. Purportedly, the purchasers learned about the affordable housing restrictions only after they had invested the time and labor to acquire the properties. (*Id.* at p. 1364.) The fact that the purchasers were on constructive notice of the recorded affordable housing restrictions did not preclude an action for damages against the seller arising out of an alleged breach of the duty to disclose. Judgment in favor of the seller, following the sustaining of a demurrer, was reversed. (*Id.* at pp. 1393, 1395, 1398.)

*Alfaro, supra,* 171 Cal.App.4th 1356 shows that just because a purchaser has constructive notice of a matter of record, this does not eliminate all of the duties of disclosure on the part of a seller or its agents. In the matter before us, assuming a title search would have revealed the existence of deeds of trust against the property, this does not mean that constructive notice of those recorded deeds of trust would necessarily preclude an action based on the alleged breach of a duty to disclose.

### (3) Balancing of factors

■ The brokers, in support of their position, cite *Merrill v. Buck* (1962) 58 Cal.2d 552 [25 Cal.Rptr. 456, 375 P.2d 304]. In a case having to do with the duty of a real estate agent to a person with whom she had no privity of contract, the court stated: " 'The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.' [Citations.]" (*Id.* at p. 562; accord, *Krug, supra,* 220 Cal.App.3d at p. 42.) The brokers argue that, applying these factors, it is clear they owed no duty to the buyers. We disagree.

The brokers do not address the first factor—" 'the extent to which the transaction was intended to affect the plaintiff.' " (*Merrill v. Buck, supra,* 58 Cal.2d at p. 562.) Obviously, the purchase and sale transaction was intended to directly affect the buyers. The first factor is squarely satisfied.

■ With regard to the foreseeability factor, the brokers contend that to impose a duty upon them in this instance would be to fashion a rule that brokers are required to divine when sellers may breach their agreements and to disclose their forecast to the buyer. Not at all. We agree that it is possible in every transaction that one party may fail to perform. However, to impose a duty to disclose upon the brokers in this case would neither necessitate that they become clairvoyant nor require them to guarantee their seller's performance. Rather, the rule we articulate in this case is simply that when a real estate agent or broker is aware that the amount of existing monetary liens and encumbrances exceeds the sales price of a residential property, so as to require either the cooperation of the lender in a short sale or the ability of the

seller to put a substantial amount of cash into the escrow in order to obtain the release of the monetary liens and encumbrances affecting title, the agent or broker has a duty to disclose this state of affairs to the buyer, so that the buyer can inquire further and evaluate whether to risk entering into a transaction with a substantial risk of failure.

We note that while the brokers address the foreseeability that a seller may fail to deliver title free and clear, they do not discuss the foreseeability that his or her failure to perform may harm the buyer. Inasmuch as they do not dispute the point, we gather the brokers concede it is foreseeable that a buyer of residential property, who positions himself or herself to be able to consummate the transaction, may suffer harm when title to the new home is not delivered.

The third factor set forth in *Merrill v. Buck, supra,* 58 Cal.2d 552 is " 'the degree of certainty that the plaintiff suffered injury.' " (*Id.* at p. 562.) The brokers do not address this factor. However, the buyers allege that they were harmed when the sellers failed to convey the property. On the review of the ruling on the demurrer, we assume the truth of the factual allegations. (*Fremont Indemnity Co. v. Fremont General Corp., supra,* 148 Cal.App.4th at p. 111.) Consequently, for the purpose of evaluating the third factor, we assume the buyers suffered injury.

With regard to the closeness of the connection between the brokers' conduct and the buyers' injury, the brokers argue that there is no connection at all. They say that the alleged injury was very simply caused by the seller's breach, not by any action of the brokers. However, the brokers could have informed the buyers that in order for the transaction to be consummated at a price of $749,000, either the lenders would have had to agree to accept less money than the amounts owing to them or the seller would have had to deposit cash into escrow to cover excess debt. Then, the buyers could have protected themselves by making inquiry about the seller's ability to close escrow and then weighing whether to take a risk on an escrow that had a substantial probability of failure.

■ Turning now to moral blame, we observe that "California cases recognize a fundamental duty on the part of a realtor to deal honestly and fairly with all parties in the sale transaction. [Citations.]" (*Krug, supra,* 220 Cal.App.3d at p. 42.) Surely a sense of rudimentary fairness would dictate that buyers in a case such as this should be informed before they open escrow and position themselves to consummate the same that there is a substantial risk that title cannot be conveyed to them.

■ *Krug, supra*, 220 Cal.App.3d 35, upon which the buyers rely, involved the sale of real property subject to an unrecorded deed of trust. When the realtor accepted the listing, he agreed to handle everything, including the unrecorded deed of trust. However, in facilitating a transaction on behalf of both the seller and the buyer, the realtor failed either to disclose to the buyer that there was an unrecorded lien against the property or to inform the holder of the unrecorded lien that a sale was about to take place. In a suit brought by the holder of the unrecorded lien, the trial court rendered judgment for the holder on a negligence theory. (*Id.* at pp. 39–40.) The appellate court held that, even though the realtor had no privity of contract with the holder, the realtor had a duty to inform him of the impending sale, or to disclose the existence of the unrecorded lien to the buyer. (*Id.* at p. 43.) The court stated: " 'There is little question that a real estate broker owes a duty of care to third persons in the transaction, where the broker does not have privity with, or fiduciary duties to, such third person. The question is the extent of that duty that will be imposed on the broker.' [Citation.]" (*Id.* at p. 42.) It continued: "Both the policy of preventing future harm and considerations of moral blame compel the imposition of a duty on the part of a realtor never to allow a desire to consummate a deal or collect a commission to take precedence over his fundamental obligation of honesty, fairness and full disclosure toward all parties." (*Id.* at p. 43.)

General duties notwithstanding, the brokers contend that they were not at liberty to disclose the information at issue in this case because to do so would have required them to violate their duty of confidentiality to the seller. In support of their position, the brokers cite Civil Code section 2079.16 and standard of practice 1-9 of the Code of Ethics and Standards of Practice of the National Association of Realtors.

■ In their discussion of Civil Code section 2079.16, the brokers cite only a single sentence thereof. That sentence provides: "An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above." (*Ibid.*) That sentence cannot be read in isolation to mean that an agent never has a duty to disclose confidential information, period. The sentence itself clearly refers to antecedent language contained in section 2079.16. That language, as applicable here, requires the seller's agent under a listing agreement to disclose that it has the following obligations to both the buyer and the seller: "(a) Diligent exercise of reasonable skill and care in performance of the agent's duties. [¶] (b) A duty of honest and fair dealing and good faith. [¶] (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties." (Civ. Code, § 2079.16.) So, the portion of section 2079.16 upon which the brokers rely provides that an agent is not required to disclose confidential information

"that does *not* involve" the enumerated affirmative duties. (Italics added.) The question in this case, then, is whether the information in question was confidential information that did "*not* involve" such duties.

First of all, the information in question, to the extent it involved the disclosure that there were three deeds of trust recorded against the property, was not confidential at all. The existence of the three deeds of trust was a matter of public record and the brokers cannot seek the cloak of confidentiality to protect themselves from the requirement to disclose the mere existence of those deeds of trust. (See 2 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 3:27, pp. 157–158.) Of course, as noted previously, that does not mean the current loan balances were of record. To the extent the buyers may seek to argue that they were entitled to know the current loan balances, that information could be construed as an element of the seller's personal and confidential financial information.

Second, as we have said, Civil Code section 2079.16 provides that there is no obligation to disclose confidential information "that does *not* involve the [enumerated] affirmative duties . . . ." (Italics added.) But here, the affirmative duty to treat each party to the transaction honestly and fairly, as expressed in section 2079.16, *is* involved. Arguably, the duty to disclose known matters materially affecting the desirability of entering into the transaction is also at issue, by analogy to the aforementioned case law.

With regard to the issue of veracity, one could argue, as do the buyers, that the representation in the multiple listing service that the property could be purchased for $749,000 was less than honest, when the brokers knew that in order for a sale to be consummated at that price a $392,000 problem had to be solved. (See Civ. Code, § 1088;[2] 2 Miller & Starr, Cal. Real Estate, *supra*, § 3:37, pp. 221–222, § 4:22, p. 4-65 (rev. 9/2010).) That is an issue we need not resolve, however. At a minimum, the brokers did not act fairly towards these residential buyers when signing them up for a real estate purchase the brokers had reason to know was a highly risky proposition. Since the brokers had a duty to act fairly towards the buyers, and fairness under the circumstances dictated disclosing that either lender approval or a substantial seller payment was required to close escrow, the portion of Civil Code section 2079.16 upon which the brokers rely did not exempt them from the duty to disclose.

---

[2] Civil Code section 1088 provides in pertinent part: "If an agent . . . places a listing or other information in the multiple listing service, that agent . . . shall be responsible for the truth of all representations and statements made by the agent . . . of which that agent . . . had knowledge or reasonably should have had knowledge to anyone injured by their falseness or inaccuracy."

The brokers seek shelter in the somewhat more restrictive language of standard of practice 1-9 of the Code of Ethics and Standards of Practice of the National Association of Realtors (2010). That standard of practice contains the following language: "REALTORS® shall not knowingly . . . : [¶] 1) reveal confidential information of clients; or [¶] 2) use confidential information of clients to the disadvantage of clients; or [¶] 3) use confidential information of clients for . . . the advantage of third parties unless: [¶] a) clients consent after full disclosure . . . ." This standard of practice, unlike Civil Code section 2079.16, makes no mention of affirmative duties of disclosure.

■ We observe that the Code of Ethics and Standards of Practice of the National Association of Realtors (2010), in the introductory words preceding the preamble, states: "While the Code of Ethics establishes obligations that may be higher than those mandated by law, in any instance where the Code of Ethics and the law conflict, the obligations of the law must take precedence." The solution to the conflict between the duty to disclose and the duty to maintain client confidentiality is clear. When the duty of fairness to all parties requires the disclosure to the buyer of confidential information reflecting a substantial risk that the escrow will not close, then the seller's real estate agent or broker must obtain the seller's permission to disclose such confidential information to the buyer, before the buyer enters into a contract to purchase the property. In a case such as the one before us, where the seller's financial situation is so precarious, if the seller is unwilling to consent to the disclosure of confidential information, and the real estate agent or broker nonetheless chooses to undertake representation of the seller, he or she does so at the peril of liability in the event the transaction goes awry due to the undisclosed risks involved. Of course, in this case, the brokers could have disclosed the existence of the deeds of trust of record without disclosing any confidential information.

■ The final factor, as noted in *Merrill v. Buck, supra*, 58 Cal.2d 552, to be applied in determining whether a seller's real estate agent or broker owes a duty to the buyer, is the policy of preventing future harm. (*Id.* at p. 562.) The brokers here say the only thing to prevent is a seller's breach and that they are not responsible for their seller's conduct. The brokers miss the point. If a seller is at substantial risk of breach, due to factors known to his or her agent or broker, the agent or broker is in a position to prevent harm to the buyer by disclosing the risk. If an informed buyer chooses to take the risk, and then suffers harm, he or she cannot blame the agent or broker who made the appropriate disclosure. The policy of preventing harm to an uninformed buyer weighs in favor of imposing a duty of disclosure on a seller's agent or broker in circumstances such as those before us.

To recapitulate, in balancing the factors set forth in *Merrill v. Buck, supra,* 58 Cal.2d 552, we conclude that the brokers in the matter before us had a duty to disclose to the buyers the existence of the deeds of trust of record, of which the brokers allegedly were aware. When a seller's real estate agent or broker is aware that the existing amount of debt on the residential real property being sold far exceeds the sales price of the property, such that either the lender's consent to a substantial discount of the debt will be required or the seller will need to put a considerable amount of cash into the escrow in order to be able to clear the debt and convey title free and clear, there is a duty on that agent or broker to disclose the state of affairs to the buyer, so the buyer can make an informed choice whether or not to enter into a transaction that has a considerable risk of failure.

This conclusion is bolstered by the decision in *Jacobs v. Freeman* (1980) 104 Cal.App.3d 177 [163 Cal.Rptr. 680], a case with certain parallels to the case before us. In *Jacobs*, purchasers entered into a contract to buy certain commercial real property from a corporate seller. One of the terms of the contract was that the approval of the seller's board of directors was required. However, the seller did not present the contract to its board of directors for approval. Rather, the seller returned the purchasers' deposits and informed them that the contract had been terminated. (*Id.* at pp. 184–186.) As it turned out, internal corporate procedures required that a contract be approved by one particular member of the board of directors before it would be presented to the full board. The director in question decided to reject the contract. Consequently, the contract was never presented to the full board. (*Id.* at p. 185.)

The appellate court in *Jacobs* held that the seller's agent (an officer of the corporation who had signed the escrow instructions) had a duty to disclose that the approval of one particular director was required before the matter would be submitted to the full board of directors. Because that disclosure was not made, the judgment of nonsuit against the purchasers was reversed so that the issue of fraud could be decided by a jury. (*Jacobs v. Freeman, supra,* 104 Cal.App.3d at pp. 182, 192–193.)

Similarly, in the case before us, it is alleged that, unless the seller had a very large amount of cash at its disposal, the approvals of two or more lenders for short sales were required, and that the brokers failed to disclose the necessity of those third party approvals, which did not come through. The seller's agents, here the brokers, had a duty to disclose that third party approvals were required before the sale could be consummated, unless of course the brokers had reason to believe that the seller had at least $392,000 in cash available to close escrow.

 By so holding, we do not convert the seller's fiduciary into the buyer's fiduciary. The seller's agent under a listing agreement owes the seller "[a] fiduciary duty of utmost care, integrity, honesty, and loyalty . . . ." (Civ. Code, § 2079.16.) Although the seller's agent does not generally owe a fiduciary duty to the buyer, he or she nonetheless owes the buyer the affirmative duties of care, honesty, good faith, fair dealing and disclosure, as reflected in Civil Code section 2079.16, as well as such other nonfiduciary duties as are otherwise imposed by law. (See *Krug, supra,* 220 Cal.App.3d at p. 42; 2 Miller & Starr, Cal. Real Estate, *supra,* § 3:36, pp. 213–214.)

## D. *Conclusion*

As indicated at the outset, "[w]hen a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action on any theory. [Citations.]" (*Yue v. City of Auburn* (1992) 3 Cal.App.4th 751, 757 [4 Cal.Rptr.2d 653].) Here, the first amended complaint asserted four theories of liability: (1) deceit based on misrepresentation; (2) deceit based on failure to disclose; (3) negligent misrepresentation; and (4) negligence. The buyers contend the first amended complaint states facts sufficient to constitute a cause of action on each of these theories. The brokers contend the first amended complaint does not state facts sufficient to constitute a cause of action on any of these theories, because each theory is predicated on a nonexistent duty of disclosure. For the same reason, they also contend that no amendment could cure the defects in the first amended complaint.

 We need not address the elements of each one of the buyers' theories, for a properly pleaded cause of action on any one of those theories will suffice to stave off a demurrer. We choose to briefly discuss the negligence theory. The "elements of a simple negligence action [are] whether [the defendant] owed a legal duty to [the plaintiff] to use due care, whether this legal duty was breached, and finally whether the breach was a proximate cause of [the plaintiff's] injury. [Citations.]" (*Easton v. Strassburger, supra,* 152 Cal.App.3d at p. 98.) We have already stated that the buyers alleged facts sufficient to impose a legal duty on the brokers. Furthermore, they have alleged facts sufficient to show a breach of that duty. Finally, the buyers alleged that the breach caused them harm. In short, the buyers stated facts sufficient to constitute a cause of action on a negligence theory. Our cursory analysis of this one theory is enough to demonstrate that the trial court erred in sustaining the brokers' demurrer without leave to amend, but is not meant to preclude the buyers' pursuit of their other theories.

## III

## DISPOSITION

The judgment is reversed. The buyers, appellants Phil and Jenille Holmes, shall recover their costs on appeal.

Bedsworth, Acting P. J., and O'Leary, J., concurred.